CRAWLEY, Judge.
Irmgard Smith (the “mother”) and Larry James Smith (the “father”) were divorced on January 12, 2001. The trial court ordered that the parties would have joint legal and physical custody of their three children,[1] who were between the ages of 5 and 11 years old when the trial court issued its divorce judgment. The parties were to exchange the children every week on Wednesdays.
On January 16, the father filed an ex parte petition for emergency relief alleging that the mother had fled Alabama with two of the children to live in Florida and that he feared the mother might also flee to Germany, her native country. The trial court immediately granted the father’s relief and entered a temporary order stating that the children were not to be removed from Marshall County or Etowah County until a final hearing was conducted. The trial court scheduled the hearing for January 26, but later rescheduled it for May 10. On January 23, the mother filed a response to the father’s petition in which she admitted to leaving Alabama with two of *939 the children but denied that she intended to keep the children from returning to Alabama. She further stated that she misunderstood the date that she was to return the children to the father.
In addition to her response, the mother moved to alter, amend, or vacate the divorce judgment on the grounds that the children’s best interests were not being served by the existing joint custody arrangement because, she says, (1) the children were to “live out of their suitcases until they reach[ed] the age of majority”; (2) the father had continued to make disparaging remarks about her despite being ordered not to do so in the divorce judgment; and (3) “it is illogical to believe that the parties will agree on any division of time with the children during the holidays.” The trial court set a hearing for the mother’s motion for March 6.
When the mother’s motion was heard on March 6, the father presented evidence relating to the mother’s removal of the children from Alabama. The mother stated that she thought the father’s allegations were to be heard at the May 10 hearing. She argued that she was not prepared to dispute the father’s allegations at the March 6 hearing. At the conclusion of the hearing, the trial court stated that it would allow the mother to be heard at a subsequent hearing, but it rescheduled the May 10 hearing for June or later. The following was recorded during the hearing on March 6:
“[Mother’s attorney]: Judge, that’s all I have at this time. We are stuck with the position of all this we have been talking about. I thought we were going to be hearing in May. So, I don’t have a lot of things I thought I was going to need.
“The court: Sure. I will leave the door open for you to offer whatever you want to offer.
“[Mother’s attorney]: Aso, part of that would be checking the court transcript of what Mr. Beck [an expert witness called by the father] testified to at trial because he testified to something that I didn’t remember him testifying to at the trial. And, also, hearing the appropriate — either documents or testimony to show that she was not going to be staying in Florida past the fourteenth of January. Plus, from her sisters about her also telling them that she had planned to take a few days vacation after the divorce was final. And, you know, I don’t have any of that now, because, like I said, I thought we were going to be discussing all that in May.
“[Father’s attorney]: Judge one thing I’d say on Mr. Beck’s testimony, Mr. Beck was here, [the mother’s attorney] could have cross-examined him at that time.
“[Mother’s attorney]: Well, it’s hard to cross-examine him about—
“[Father’s attorney]: I just hate to keep delaying—
“[Mother’s attorney]: It’s hard to cross-examine him about something without having the transcript of the hearing that I didn’t know I was going to need because I didn’t know we were going to be hearing from Mr. Beck yesterday because that was the hearing set for May.
“[Father’s attorney]: Well, you didn’t request the transcript already and, I guess, you know, if we waited until May to have the hearing you wouldn’t have the transcript at that time.
“The Court: Counsel is saying that he cannot be totally prepared until May which is fine and good but I can’t make any drastic changes until May either.
“[Mother’s attorney]: Well, I’m understanding. I’m saying I could have *940 been prepared before May. I’m just saying I thought the hearing on this issue was in May.
“The Court: Well, I didn’t know what the issues were going to be other than it was supposed to have been 80 minutes yesterday.
“[Mother’s attorney]: That’s what— my motion would have been 30 minutes yesterday, Judge but—
“The court: So you could have had the transcript and done all you needed to have done yesterday in your 30 minutes?
“[Mother’s attorney]: No, sir, that transcript would not have been under anything from my motion. That was under his motion is what I’m saying.
“The court: Ml right. Well, like I said, I left the door open for you to offer whatever you want to now or between now and May or May whatever-the-day-is.
“The court: Well what do you want final about it? Again, unless I dose the door on his motion, which I already told him [the mother’s attorney] I would not do. He says he was prepared to go in May because there is an order setting something in May and we have got to give him his day in court in May.
“[Father’s attorney]: Okay. Well, Judge, we rest right now.
“[Mother’s attorney]: I’m saying, Judge, I can come up with things before May but I just know that was the date that was here.
“The court: Well, I’m booked until June. If you’re going to get your May date we have got to put it off until June because I am booked from now until June, maybe later, ... [I]f there’s something you can offer without having to take further testimony, yeah, you can go right ahead if that makes it where we can go ahead and act on it without having a further hearing. If not, again, I have already told you I would give you additional time and I will certainly adhere to what I said I would do.
“[Mother’s attorney]: Okay.
“[Father’s attorney]: Judge, I can look into ways of getting that without needing additional testimony.
“The court: Okay. Just let us know so we can go ahead and act on it. If not, then — y’all want me to cure a lot of ills that two or three judges have handled over the space of a year in two hours and 30 minutes of hearing. I don’t have the wisdom of Solomon. So, I don’t think I can do that. I will have to hear more. Let me know, Chris [the Mother’s attorney], if you are ready to submit it. If not, then we have got another date.
“[Mother’s attorney]: Yes, sir.”
(Emphasis added.)
On April 25, the mother’s attorney filed a motion to withdraw. The trial court granted the motion on April 25. The mother’s new attorney entered an appearance on May 9. The mother states in her brief that after her new attorney filed his notice of appearance she learned that the trial court had issued an order on May 3, granting sole physical custody to the father.
The mother appeals, arguing that the trial court denied her due process by failing to give her the opportunity to be heard on the father’s petitions. Specifically, she contends that she was not prepared, at the March 6 hearing, to refute the father’s allegations as set out in his emergency petition.
Clearly, the trial court intended to conduct an additional hearing on the father’s emergency petition, and the mother was *941 justified in believing this was the ease, although it is not clear when the trial court planned to conduct this hearing. Even though the trial court had scheduled a hearing on the father’s petition for May 10, the trial court appears to have cancelled the May 10 hearing at the March 6 hearing when it said, iCWell, I’m booked until June. If you’re going to get your May date we have got to put it off until June because I am booked from now until June, maybe later.” The record does not indicate when the trial court would hold the hearing.
The purpose of the March 6 hearing was to determine if the current physical custody arrangements should be altered for the best interests of the children. Applying the “best interests” standard, the trial court determined that the joint custody provision of the divorce judgment was no longer feasible after the mother’s move to Florida and that the father should have sole physical custody. We hold that the trial court’s determination was supported by the evidence and is due to be upheld.
Appellate courts presume that a trial court’s determination regarding the modification of the custody provision of a divorce judgment is correct because the trial court had the opportunity to hear the evidence and observe the witnesses and, thus, is in the best position to adjudge the best interests of the minor children. Voloshik v. Voloshik, 505 So.2d 1233 (Ala.Civ.App.1986). The trial court’s determination will not be disturbed on appeal unless the evidence fails to support the determination and it appears to be plainly and palpably wrong. Voloshik, 505 So.2d at 1233.
In making its decision, the trial court held that “this change of custody would also be the least disruptive alternative for the parties’ minor children.” Even if the mother did not intend to keep the children from returning to the father, and even if she had fully complied with the divorce judgment, the trial court could have found that the weekly traveling from Etowah County to Stuart, Florida (which is on the Atlantic coast, approximately halfway between Orlando and Miami), was not in the best interest of the children. See Carr v. Howard 777 So.2d 738, 742 (Ala.Civ.App.2000), where the this court held that “[t]he frequency and length of the travel required ... must be a factor in the consideration of what serves the children’s best interests.” Given the distance to be traveled in this case, the trial court was within its discretion to determine that traveling between Stuart, Florida, and Etowah County, Alabama, each week would create a disruption to the children. Even if we give the mother the benefit of the doubt and assume that she did intend to bring the children back to Alabama, the logistics of transferring the children back and forth on a weekly basis would clearly interfere with their attendance in school. Therefore, even if the trial court had erred by not allowing the mother to present additional evidence before it ruled on the custody-modification issue, such an error would be harmless as it pertains to the issue of custody. The same cannot be said, however, as it pertains to the trial court’s determination of the mother’s visitation rights.
As part of its modification order, the trial court found that the mother “left with the parties’ two youngest children, and went to the State of Florida with no intent of abiding by the Final [Judgment] of Divorce or returning to the State of Alabama.” As a result of this finding, the trial court restricted the mother’s visits with the children. The trial court required the mother’s visits to be held at the father’s residence, or at his mother’s residence so long as the mother informed the father two weeks in advance of the visit.
*942 Because the mother was given such limited visitation, we conclude that the mother was prejudiced by being prevented from offering further testimony on the following issues: (1) her intent in traveling to Florida and failing to return the children; and (2) her mental state as it relates to the issue of flight.
The evidence showed that the mother had moved to Florida with the intent of living there permanently. The mother testified to the following:
“A: ... What I intended to do — fill my promise to my children that when the divorce is over we [are] going to go on vacation, which we did, for the long weekend. In addition to that, I explored the options down there to see how the job market is, how the housing situation is and—
“Q: So, the truth is that you didn’t intend on staying in this area, correct? Yes or no.
“A: I was — yes, I thought so, but I’ve been looking for work for over year and had not found one.
“Q: Well, right now your are currently residing in Florida?
“A: No, I’m living with my aunt right now.
“Q: That’s in Florida, correct?
“A: That’s correct.”
A transcribed version of a taped telephone conversation was introduced into evidence without an objection by the mother. During the conversation the mother indicated to the father that she planned to stay in Florida with her aunt. The following was recorded on January 11:
“[The father]: Have you got any money?
“[The mother]: Well, I have my credit cards.
“[The father]: That’s all?
“[The mother]: I’ll get by until I find a job.
“[The father]: What about your house and everything that’s in it?
“[The mother]: I’m coming back to get that. I just have to find a place to put my stuff in. I didn’t want to take it ... and not have storage somewhere.
“[The father]: So it will be 2 or 3 weeks before you come back?
“[The mother]: Huh?
“[The father]: 2 or 3 weeks?
“[The mother]: Probably not 2 or 3 weeks, but I don’t think I’ll find something next week either. I have to get work and a place to live.
“[The father]: Yea, are y’all leaving in the morning going down to [Stuart]?
“[The mother]: We are there already.
“[The father]: You aren’t going to come back up here for a long time you said.
“[The mother]: Well, I’m trying to And a place to stay and it’s probably not very easy because.... So I’ll find a place to stay and then I’ll come up and get my stuff.
“[The father]: Ok. So you are staying in Florida, you aren’t going to Germany?
“[The mother]: Not for right now. If we can work something out sensible then I’m going to stay here. But if we don’t get along then I’m not going to stay here.”
In another taped telephone conversation recorded on March 1, the mother spoke with the children. The following was recorded:
“[C]: Did you find a house yet?
“[The mother]: Yes.
“[C]: Did you?
*943 “[The mother]: With a swimming pool.
“[C]: Really?
“[The mother]: Yes.
“[C]: What have you been doing today.
“[The mother]: Well, working hard. I have a tough job, I have to work hard.
“[C]: Did you go swimming in the ocean today?
[The mother]: No, I don’t swim in the ocean [C]. By the time I get home from work, it is dark by that time. I swim in the pool sometimes.
[[Image here]]
“[The mother]: Well, if you can. Call me at Boaz. I’ll be at Boaz on Sunday, Monday, and Tuesday and I’m going to leave on Wednesday.
[[Image here]]
“[The mother]: I have a house with a swimming pool....
“[H]: You do?
[[Image here]]
“[C]: Did you rent that house already?
“[The mother]: I’m going to buy it [C].
“[C]: Did you buy it already?
“[The mother]: I will tomorrow.
“[C]: Oh, well we’ll see you, bye.
“[The mother]: I’ll be in Boaz on the weekend.
“[C]: Really?
“[The mother]: So you can call me [in] Boaz.
“[C]: Ok.
“[The mother]: I will be leaving Saturday and drive up and I’ll be there Sunday, Monday, and Tuesday is the court date, [C].”
Furthermore, the trial court also based its judgment on, among other things, the testimony of Jacky Beck, a counselor who testified that the mother had suffered from delusions and panic attacks that could result in her fleeing. Beck also opined that the father would be best suited to have custody of the children because that is where they had always lived and attended school.
Because the trial court placed an importance on the mother’s intent not to return to Alabama, we hold that it erred by failing to allow the mother the opportunity it promised her to offer further evidence on this issue before it ruled. Because the court structured the visitation provisions of its judgment without hearing the mother’s additional evidence, and because the visitation provision was extremely restrictive to the mother, we cannot find that the trial court’s error was harmless. We therefore reverse and remand so that the trial court can hear additional evidence from the mother as to her intent to abide by the final divorce judgment. The trial court is to reconsider its modification order only as it relates to the mother’s visitation with the children.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
YATES, P.J., and THOMPSON and PITTMAN, JJ., concur.
MURDOCK, J., concurs in the result.

. Two of the children were children of the father's brother and the brother's wife whom the parties adopted when the brother and his wife died.